FILED

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT   '05 JUL -8 P 1:23

| | |
|---|---|
| VORCELIA OLIPHANT,<br>　　Plaintiff,<br>vs.<br>STATE OF CONNECTICUT DEPARTMENT OF TRANSPORTATION, ET AL.<br>　　Defendants | CIVIL NO. 3:02CV0700(PCD)<br>U.S. DISTRICT COURT<br>NEW HAVEN CT<br><br>July 7, 2005 |

### FEDERAL RULE OF CIVIL PROCEDURE LOCAL RULE 56(a) (2) PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS

Pursuant to Fed R. Civ. Procedure Rule 56 and Local Rule 56 (a)(2), Plaintiff submits this statement in response to defendants' statement of material facts as to which facts plaintiff admits or denies. The "disputed issues of material fact" to which she contends there is a genuine issue to be tried is accompanied with plaintiff's supporting documents referenced in plaintiff's Appendix and Index of Evidence.

　　Paragraph No. 1:　　Admit

　　Paragraph No. 2:　　Deny, Plaintiff was placed on Family Medical Leave prior, she was out ill for a period from about August 23, 2003 to September 25, 2003 and from about September 27, 2003 to October 15, 2003 ( Ex. No. 1, Request for Family/Medical Leave Documentation with note mailed from James Connery)

　　Paragraph No.3:　　Deny in part: Disability retirement application was filed on February 2, 2004, effective date was February 1, 2004. (See Defendants exhibit No. 3 Part I of application)

　　Paragraph No. 4:　　Deny in part. The matter is not fully resolved it's pending appeal. ( Ex. 2, Letter Dated April 15, 2005 from Plaintiff to Mr. Lanteri appeal of the decision; Ex. 2A, Letter dated December 1, 2004 to Chairperson of the State Medical

Examining Board giving notice of appeal and requesting information that decision was based on..

Paragraph No. 5:   Admit in part, Plaintiff raised other concerns in addition to treatment from the secretary in this response. (Defendants Ex. 1, Plaintiff's Responses to Defendant's Interrogartories, dated March 6, 2003, unnumbered page 10 Answer # 24).

Paragraph No. 6:   Deny, January 24, 2001, Plaintiff filed (hand-delivered) complaint letter with Affirmative Action regarding testing issue and discrimination (Exhibit 3, complaint letter dated January 24, 2001). Affirmative action avoided and did no "intake" of the complaint. On March 14, 2001 Plaintiff emailed requesting a meeting (Ex. 3A, email from Plaintiff to Affirmative Action, Ms. Cordula dated March 14, 2001, 1:01 PM). Plaintiff made a second request on March 23, 2001, (Ex. 3B, Memo from plaintiff to Affirmative Action Ms. Cordula dated March 23, 2001 1:06 PM) Affirmative Action followed through on none of the legal procedure between January 24, 2001 through April 19, 2001 (Ex.3C, memo from plaintiff to Affirmative Action, Ms. Cordula dated April 19, 2001 11:36 AM, Ex. 3D, plaintiff depo. Page 82: 4-25, page 83: 1-5). Union filed an Institutional Grievance concerning the testing issue in year 2000, not the plaintiff(Ex. 3E, emails from Jay Doody regarding test issue, and letter to Doctor Libby of Dept. of Admin. Service). Plaintiff then filed a grievance through the union regarding reclassification of her position only on February 22, 2001 (Ex. 4, classification appeal form). Plaintiff filed CHRO complaint on April 2, 2001 (Ex. 5, Connecticut Commission on Human Rights and Opportunities Affidavit of Illegal Discrimination Practice).

Paragraph No. 7:   Deny see paragraph 6 (six) above. Affirmative Action Complaint was hand delivered on January 24, 2001 and also a copy sent by registered

mail received by Affirmative Action on February 1, 2001. (See hand written note on defendants' copy Ex. No. 5, same as plaintiff Ex. No. 3 without the note).

Paragraph 8: Admit, see no. 6 (six) above.

Paragraph 9: Admit

Paragraph 10: Admit, (Ex. No. 6 (six)

Paragraph 11: Admit

Paragraph 12: Admit

Paragraph 13: Admit in part. Plaintiff filed complaint with CHRO March 18, 2004 then Plaintiff filed a complaint in the U.S. District Court of Connecticut (Hartford) Docket NO. 3:04 CV 00274 (Chitigney) which as been consolidated with 3:02 cv700 this action. Paragraph 14: Deny: After plaintiff formed group, Minorities in Action and filed complaints in 2001, Defendants began a campaign attempting create grounds for discipline where none existed. Service ratings were no longer done in the normal course of business. This they first started with attendance—claims of tardiness and sick time usage and trying to make issues for tardiness where none existed. Plaintiff placed two rebuttals for a wrongful counseling sessions and derogatory information in her employee file which the defendants acquiesced because they did not reply or rebut (Ex.No.7). Neither did they provide a rebuttal to plaintiff's Affirmative Action complaint of January 30, 2003. (See paragraph No. 10 above, Ex. 6, Docket 66, 68) Here again, Affirmative Action did not follow its procedures for the processing of the complaint beyond doing intake and even that they tried to avoid by making issues where none existed.

Paragraph 15: Deny, The derogatory information related to plaintiff's service rating such as alleged excessive sick leave usage and alleged tardiness and noted

3

plaintiff's service rating for which she was "counseled", plaintiff provided a rebuttal for her employee file and such is grievable and under article 8 Section 3 of collective bargaining unit agreement, (Exhibit No. 8)

Paragraph No. 16: Deny. Verbal counseling was not done in the normal course of employment but was defendants attempt to make grounds for discipline to require counseling and create means of entering derogatory information in plaintiff's file beginning after 2001. See Plaintiff's response to paragraph Number 27 below.

Paragraph No. 17     Admit in part:  Pursuant to Federal Rule of Civ. Procedure 46 plaintiff takes exception to Court's ruling Docket No. 111. Plaintiff makes the offer of proof that since 1996 she was denied FMLA for a reoccurring illness inspite of the illness being collaborated with documentation by doctors and after plaintiff had been out of work for over two consecutive months from about July to September. Plaintiff after that time relied had to rely on her own vacation time, personal leave time, etc for the illness and the various medical appointments to avoid poor service ratings. In September 2000, plaintiff service rating showed high sick time usage but it was in satisfactory category. Plaintiff did not sign this Service Rating but placed a note in her signature box saying " Please see atttached". Attached was an explanation of what had occurred regarding sick time usage and the personnel's Francine Houston's antics over Medical Certificates and the overall issue regarding sick time usage. (Ex. 9, CHRO Case No. 0110381 Plaintiff Affidavit page 9-10, Ex. 9A, Sept. 13, 2000 service rating and attached memo to Jo Ann Devine regarding Sick time usage on service rating) It was not until after plaintiff organized the Minorities In Action (MIA) and filed complaints that her supervisors began attempting to document bad service ratings with regards to sick time

usage and use it as grounds for discipline or "counseling"(See Exhibit No.9b, Written Notice of Counseling Memorandum from 9-1-00 to 7-26-01, and 9-1-01 to 6-10-02) Plaintiff offer of proof would be emails dated November 22, 2002, 1:33 pm from plaintiff to Francine Houston regarding sick leave and FMLA; email November 20, 2002 9:21 AM From Connery to Plaintiff discussing sick leave and coding and FMLA; email November 21, 2002 8:30 AM Plaintiff response stating Houston's lack of response and a note –handwritten on the email dated 11/25/02 2:45 pm call from Houston leaving a message for Peggy Desroberts, secretary; Email Nov. 22, 2002, 2:59 pm from Connery to plaintiff ,Email November 25, 2002 8:45 AM from plaintiff to Connery; Email on December 17, 2002 from Connery to Plaintff at 1:02 pm, Email on December 18, 2002 8:29 am cc' Francine Houston, Email Dec. 12, 2002 11:50 am from plaintiff to Connery. All these emails show the pattern used regarding plaintiff her hospitaliztion for a reoccuring illness in 2002, how the department handled her sick time usage and FMLA and the issue of trying to clear-up how the department documented the illness as something different than what her medical statement documented the illness as.

Paragraph No. 18:    Deny:in part   The date of this notice was August 22, 2003 Defendant Wanda Seldon informed plaintiff of Fact-finding not August 27, 2002. Plaintiff filed for Injunctive Relief prior in April 2003 for the escalating hostile office environment (Docket 66, 68) and in an appeal in United States Circuit Docket No. 03-7772 September 26, 2004

Paragraph 19: Admit

Paragraph 20: Deny: copies did not number 502 Testimony at fact-finding revealed that the same information on the leave slips were disseminated throughout the

unit via email by the secretary and the information on the leave slips could not have been confidential which is how plaintiff could compare what was on the computer printouts with P-4 leave slips given to Kim. Plaintiff testified at fact-finding that she never went in secretary's desk; leave slips were not kept in her desk but in an unlocked file drawer by her desk in order that the leave slips could be accessible to everyone. In the meeting with Connery and Kaminsky in Lonergan's office on August 22, 2003 plaintiff stated why she had copied the slips as she has explained throughout. It was when defendants realized plaintiff could show that she had been singled out concerning the slip policy and outlook calendar that she was subjected to a fact finding and suspended for five days which is extreme for something of this nature. (Exhibit 10, Affidavit from Timothy McGuane, P-4 Counsel Steward). Defendants were constantly claiming that plaintiff was not placing information on the outlook calendar when she had been. Plaintiff takes exception to Court's ruling No. 111 and would offer as proof if she could emails showing how the outlook calendar was a pretext This was nothing more than defendants' attempt to create grounds to reprimand the plaintiff. The following emails would show this if they could be offered as proof: October 4, 2002, 1:41 pm from Connery to plaintiff; October 7, 2002 8:40 am from Plaintiff to connery; October 7, 2002, 9:10 am from plaintiff to Connery, October 7, 2002 9:35 am, Connery to Plaintiff; Oct. 11, 2002 8:44 am plaintiff to Connery, Oct. 11, 2002, 8:45 plaintiff to Connery, Oct 7, 2002 9:22 am Connery to Oliphant, October 11, 9:45 am Oliphant to Connery; January 7, 2003 10:49 Connery to Plaintiff, January 7, 2003 12:43 Oliphant to Connery; January 8, 2003, 12:45 Connery to Plaintiff; January 8, 2003 1:48 pm, plaintiff to Connery, January 7, 2003 1:05 pm, connery to Plaintiff; January 8, 2003 1:53 pm Plaintiff to Connery. These will show how

the defendants were using the outlook calendar as a means to reprimand plaintiff. She consistently requested her supervisors to have her computer checked by PC support and it never was (ex. No.11, Plaintiff Depo. Pages. 103:25, page 104-118:1-5, Ex. 12, 5 Emails 4 dated January 7- January 8, 2003, 1on April 3, 2003 between Plaintiff and Connery, Ex. 13, 9 emails between Connery and plaintiff dated 10/4/02, 10/7/02, 8:40 am, 10/7/02 9:10 am, 10/7/02 9:35 am, 10/07/02 9:22am, 10/11/02 8:44 am, 10/11/02 8:45 am, 10/11/02 9:45 am,.and 4 emails to Alberta Goodwin and plaintiff w/ supervisors cc'd dated April 1 through April 8, 2003 from 9:18 am to 9:27 am. Plaintiff requesting computer problems to be checked.).

Paragraph No. 21    Deny. From the fact-finding Leave slips copied contained the same information as did daily logs emailed to everyone in the unit. Everyone did not put in leave slips. But there was never no indication that this had changed especially for the plaintiff. (Ex. No. 10, Affidavit of Timothy Mcguane)

Paragraph 22: Deny. Plaintiff takes exception pursuant Federal Rule of Civil Procedure 46 to Court's ruling No. 111. Record of testimony given at fact-finding is not true at to what plaintiff testified to and what other's testified to at the fact finding; many significant details in the fact-finding minutes have been omitted. The fact-finding was the pinnacle in the defendants pretext campaign to reprimand the plaintiff There was never a policy made known for retrieving the leave slips. The office practice had been that the Administrative secretary always had leave slips available for anyone to retrieve in the event the Administrative secretary was not available which is why they were not kept in her desk drawer but in an unlocked file drawer in her area. Defendants' made an issue of the technicality of a department policy that was never a practice in plaintiff's office

which is why plaintiff was not violating what was normally done in the course of business in her office and neither was she aware that by retrieving or copying the leave slips in accordance as to what was done in the office, that she could be considered in violation of a department policy. She did not have to and never did she enter the secretary's desk to retrieve the leave slips. Defendants' realized that plaintiff could now show with both the leave slips and the information printed from her outlook calendar of the office daily attendance log (emailed to everyone in the office daily) how, as a result of the previous days meeting, that she was being singled out concerning the leave slip issue and information placed on the outlook calendar. For that reason defendants' made plaintiff's having access and copying the leave slips to appear as though she had violated a department policy when such was not at all the office practice or the case: Plaintiff's boss was away from the office and not available for her to show him this information. Therefore, plaintiff copied the slips to present to him along with the daily attendance logs from her computer, to show him how she was in no way failing to comply with the office rules for giving leave slips nor to put information on her outlook calendar of her times off but rather how she was being subject for "counseling" and held to an extreme stringent standard than others he supervised and others in the office who was shown on the daily attendance logs to be off from work and the reasons and yet they had no leave slips commensurate with the many times off shown on the daily attendance logs.

  Plaintiff's offer of proof is 1) her own behavior: does not fit for a person wrongly taking leave slips; this would not have been done in plain view as defendants have testified (Ex. Page 5 Paragraph 1 of alleged minutes of the fact-finding) yet plaintiff both retrieved the slips as was normally done and copied them in plain view of everyone

entering and leaving the office as the office Xerox machine is in plain view of everyone leaving and entering the office as witnesses at the fact-finding testified. In addition, plaintiff had no reason to believe that information on the slips was confidential; She testified as did others that she was making copies at lunch time when the Xerox machine and the copying is in plain view of everyone entering and returning from lunch. Plaintiff had no reason to believe this was not related to her work as it was part of the defendants previous day alleged "counseling meeting" regarding an alleged descrepency to put in a leave slip and information on her outlook calendar. Plaintiff had already completed the work from Mr. Kaminsky that she was assigned. From testimony from the fact-finding as evidence that plaintiff presents from the testimonies given that Plaintiff did not secretly retrieve the leave slips( ex. 14, page 3 Paragraph 5); nor copy them in secret but in plain view of everyone present in the office(ex. 14, paragraph 1,3), including everybody leaving and entering the office as the Xerox machine is located in the main corridor and entrance to the office. This does not depict the behavior of someone who is doing something contrary to what is normally done in the course of business in her office( Ex. 14 , alleged Fact-Finding Meeting minutes for Vorcelia Oliphant September 26, 2002 and Plaintiff's Affidavit dated September 26, 2003) Offer of proof is emails showing problems with the computer plaintiff repeatedly requested be checked and in addition when information had been long on her computer defendants would attempt to set-up meetings disregarding the information on her outlook calendar or pretending not to see it(email from Brian Castler related to plaintiff's duties and his giving a time to meet to discuss the issue at the same time of a trac training date on her calendar). This would

9

show that the defendants used the outlook calendar as grounds to create a pretext to reprimand and harass and Plaintiff. (See Exhibit No.11,12,13). .

Paragraph No. 23: Deny, See 22 above. Plaintiff takes exception to court's ruling Docket No. 111 It was determined that plaintiff was to receive a five-day suspension yet plaintiff prior to and after the fact finding was out on sick leave and had not return to work. Yet the five day suspension was or could **not** have been served by the plaintiff, none the less, when plaintiff retrieved her personnel file from the department she noted that between Janaury 12, 2004 and January 17, 2004 she had allegedly "served" the suspension but she was physically unable to attend work or serve the suspension ( See Exhibit No. 16). Neither was she notified by the defendants' that she had "technically served" the suspension. Serving a suspension is necessary to bring union action to grieve or arbitrate the matter. Plaintiff contends that retrieving the slips was done as is normally done in the office(ex. 16, page 6, paragraph XXIII, XXIV. In addition plaintiff contends that the fact-finding is a biased forum made up of all DOT employees who are employees of the Office of Construction, the division for which plaintiff is employed. Plaintiff contends that all had self-serving interest in this fact-finding and were not at all unbiased. Fact-finding minutes are not true to the testimony given (Ex. 14,15) Plaintiff offer of proof is were she not barred by the courts' ruling No. 111 would be affidavits from other individuals familiar with the office practices in comparison with department policy that plaintiff's subpoena's per Fed. Rule of Civ. Procedure 56(f) was quashed for this information.

Paragraph 24: Deny , plaintiff's had requested dates that her supervisor alleged she was not complying with office leave slip policy and putting times off on the outlook

10

calendar. Plaintiff's supervisor told plaintiff to retrieve the information herself (Ex. 15, page 5, PARAGRAPH XX). (In the previous day's meeting, on or about August 21, 2003 provided her no dates of alleged tardiness or times off without slips or dates off not on her calendar. This was a pretext to have plaintiff reprimanded by "counseling" Plaintiff story is the same as she has maintained from the time she was confronted by the defendants on August 22, 2003 in Mike Lonergan's office, which is not what was accurately testified to by Connery or Kaminsky nor plaintiff's testimony accurately recorded in the fact-finding minutes as to what plaintiff said. Other than for the meeting on August 21, 2003 plaintiff had no reason to review the slips or the information on her outlook calendar sent by the secretary on the daily attendance log. It was in the course of plaintiff retrieving her slips after having reviewed portions of the log on her computer that plaintiff noticed none of the others in her immediate unit were giving leave slips. Defendants were attempting to reprimand plaintiff for one date that defendants claimed was not on a leave slip but was on plaintiff's calendar when others were not handing in leave slips to commensurate with the times off they were taking. Plaintiff only became aware of this because she had to leaf through others' slips to get to her own. : Plaintiff offer of proof if she not barred of emails, all showing that plaintiff was being singled out by the defendants and the outlook issue was a p pretext to reprimand plaintiff. ( Ex. Plaintiff's depo. P. 101:3-25;

    Paragraph 25: Admit

    Paragraph 26: Admit

    Paragraph 27:Deny: Plaintiff believed defendants had second hand knowledge of the meetings of the Minorities In Action (MIA) group by word of mouth of those who

either received mailings, attended the meetings or communicated with those who did. MIA did not conduct its business at work but could not control what was discussed outside of its meetings by attendees. (Ex. Plaintiff's Affidavit page 153 lines 8-11, page 150 lines 7 through page 153 lines 11).

Defendants' affidavits as presented are biased. Defendants have an interest in the outcome because they are the parties to the retaliation plaintiff experienced from them. Because of the retaliation plaintiff experienced from the defendants and the timing of it she believes that was a direct result of the meetings of the group she organized, Minorities In Action (Defendants' had a method of impromtu meetings with which plaintiff would not be notified before hand the purpose of the meetings were "counseling" or to reprimand. **Plaintiff pursuant to Federal Rule of Civil Procedure 46, takes exception to court's ruling 111 and plaintiff offer proof if she could submit it.** 1) The group's, Minorities In Action (MIA) third meeting agenda that shows the date of the group's meeting held on March 13, 2001. Plaintiff would provide 2) Email from Brian Castler dated for Tuesday April 3, 2001 at 9:07 AM, cc'd Kenneth E. Fargnoli, Arthur W. Gruhn, subject: OPPORTUNITY TO TRY NEW POSITION. wherein he refers to Ken Fargnoli making a quasi-offering for a Transportation Engineer II position on March 20, 2001(seven days after MIA third meeting), it mentions Jay Doody, union steward as the go between and how Castler was aware he was on vacation till April 9th and yet how Castler needed an answer by April 9, 2001. 3) Plaintiff email response dated April 3, 2001, 9:47 AM to B.Castler plaintiff mentions her concern over the consequences if they are not satisfied with her work within the thirty day conditional trial period they propose in the quasi offering.

4) Email dated April 3, 2001 10:59AM Castler replies that plaintiff would return to old position if they are not satisfied within the 30 days try-out time.

5) April 4, 2001 4:24 PM Plaintiff email reply that she was expecting Jay Doody, union representative be present for any meeting regarding the offer and how he had informed her when he was last at the office on or about March 21, 2001 that he would be on vacation until April 9, 2001 and **would be** available to meet when he returned. Plaintiff mentions how she believed defendants were aware of Doody's vacation, mentions how it is they insist on a reply by April 9th. She request if it could wait until Jay returns. 6) Email Notice: Defendants Do not read plaintiff's reply until April 9, 2001 at 6:51 AM, 7) Castler reply to plaintiff's email until April 9, 2001 at 7:37 AM, stating that they can not hold off any longer going out to fill *(the position)* and ask plaintiff whether or not she was interested. 8) Email response from plaintiff dated April 9, 2001 at 8:58 AM she states that in light of everything going on she decline and thanked him.

9) Oath of Jay Doody CHRO No. 0110381 dated July 19th 2001 stating the offer of the position offered out on July 5, 2001 about three months after defendants' claim for immediate need to "offer out the position and for plaintiff's immediate reply, and oath is of defendant's repeated violations made against plaintiff regarding State Statutue 5-227a and DAS General Letter 226 and also he states the proper method for reclassification of position, and to do what defendants were doing was in violation of state regulations, he also stated how the one month informal try-out of the position was illegal. These emails would show the defendants retalitory actions against plaintiff.

Other retaliation offer of proof plaintiff would make is that pertaining to defendants' beginning campaign of "counseling" reprimands with regards to alleged sick

time and alleged tardiness: The beginning of other impromptu meetings pretext for reprimands one occurred October 18, 2001. Plaintiff offer of proof would be emails dated Thursday October 18, 2001 9:08 AM thru October 18, 2001 1:24 PM. They would be as follows:

9:08 AM From Vorcelia to Kenneth Fargnoli she questions why he and Ann-Marie are receiving her response to Jim Connery's meeting request when they have not been cc'd by her, she then reiterates his position of allegedly not knowing what the meeting request is about, she request to be informed before the meeting of its purpose in order to be prepared, she also request to have the meeting postponed should it appear that she would be more comfortable having someone from the union with her at the meeting.

9:31 AM Fargnoli responds that he will not let her postpone a meeting that Jim has directed her to attend and he will try to find-out the purpose of the meeting.

10:16 AM Plaintiff responds thanking him and reiterating that she would like to be prepared for any meeting and can not if she does not know the purpose.

1:24 PM Oliphant responds that she has been informed (Connery called) the purpose of the meeting is alleged "counseling" regarding her whereabouts on Monday October 15, 2001 and how she takes any counseling seriously.

Memorandum from Ann De Luca, R.N. nurse documenting plaintiff was seen twice in her office on October 15, 2001 9:45 AM to 9:50 and again from 10:45 AM to 11:15 AM, memo shows the date plaintiff retrieved the Memo on 10-18-01(Ex. 31).

Plaintiff would also provide as an offer of proof harassment regarding her outlook calendar, if she could, emails regarding computer problems: 1) Plaintiff to Joseph Bouchey On May 15, 2001 9:00 AM approximately two months after the documented

MIA meeting, plaintiff computer clock is disfunctional, 2) 9:30 AM Bouchey responds to contact Nester (computer people) at X 3500, 3) May 31, 2001 7:23 AM plaintiff requests Nester's email information because phone calls are not being responded to. Plaintiff also mentions that the computer clock and now the dates are not functioning properly documenting her work for a previous date and time. Plaintiff notes that she was assigned to work out (Pascone Place) of the office all day, that she had logged off and turned off her computer the previous day but it was on when she returned as though it was being worked on. Plaintiff offer of proof would show from about this time, in June 2001 defendants began insisting that she track her work, and whereabouts on outlook calendar-emails. The emails would show a pretext exist that something was wrong with plaintiff computer about the same time defendants began outlook calendar campaign against plaintiff. She would also offer at this time, further proof of harassment regarding this and show pretext of how her computer consistently did not record all outlook, she made her boss aware of the problem they did nothing about it yet were always seeking to reprimand her and have "counselings" on this issue (See Exhibit Plaintiff's deposition page 109 line 22-page 112 line 22) which also led to the meeting on August 21, 2003 ( which also began as an "impromptu "Counseling" on or about August 14, 2003 and led to plaintiff attempt to clear-up the false accusations which led to her finding that others in her office was not being held to this stringent standard which led to the fact-finding on September 26, 2003. *Evidence - Defendants # 2E p.2 is contrived, never mentioned on or before 8/21/03, only mentioned here, plaintiff unaware of these dates and accusations for (70) tardiness and threatening behavior*

In August 2001 defendants' continued their campaign of tardiness and regarding alleged sick leave and alleged tardiness. This was following within six months of the last MIA meeting. (Ex. 9B, Memorandum, Subject: Written Notice of Sick Leave,

15

Counseling contract: P-4 Article : 43, dated 8-9-01 for the period September 1, 2000 and July 26, 2001 Signed by James Connery). Wherein after the meeting, and after plaintiff signed the memo, there was added a notation signed by her boss Connery saying "also verbally counseled Vorcelia regarding tardiness". (Ex,9B, Another Memorandum for "counseling" for alleged sick time usage for period September 1, 2001 to June 10, 2002). All began after plaintiff organized the group MIA.  Plaintiff would also provide (Ex.9A, Service rating its attached memo to Joann Devine) medical documentation from that period that placed her under a doctor's care and show as her offer of proof documents of how she was denied FMLA and told to provide medical information, which she acquired from her physicians without being given any indication of how it was to be used or why she was to provide it and without knowing the possibility of FMLA.  And emails in follow-up to Personnel, and Ms. Francine Houston; including her being told she would have to pay out of her pocket a fee regarding a sick certificate which also appeared to be a violation of state and federal regulations and for which she was not permitted FMLA coverage. (Ex. 9, CHRO Case no. 0110381 Plaintiff's rebuttals dated July 25, 2001 delivered to defendants and affirmed to on August 10, 2001, pages 9-11, Ex. 9A). Plaintiff would also offer proof that the denial of the Medical Certificates(Ex. 9, on page 11 of CHRO complaint) was the same treatment plaintiff received on August 14, 2003 when she requested the documents from her supervisor, James Connery, needed per Department of Transportation policy, for the emergency visit to be seen by her doctor on or about August 14, 2003 (Ex. 17, emails to and from Connery and Plaintiff but she was being denied medical forms required by the department from doctor.

Also, plaintiff additional offer of proof if she could would show how defendants began changing her duties during this time. In particular her email dated March 8, 2001 at 4:00 PM, the time within which the group was meeting emails dated from about July 21, 2003 through August 22, 2003 and (Plaintiff deposition page 134, line 9-12, page)

Lastly, plaintiff both in deposition and in this reply understood the defendants' affidavits of their "personal knowledge" of the MIA to be first hand knowledge which plaintiff testified to that she did not believed they possessed but that through word of mouth they would have known. However, because of the proximity of the timing of the treatment plaintiff received occurring immediately during the times of the meetings of the group, plaintiff believes the defendants had gained knowledge of MIA and retaliated against her for that. See Exhibit 29a Plaintiff's deposition page 136, line 2 through page 137 line 18.; page 147, line 8-17;page 34 line 17-19; Page 118 6-19 ( (Ex. 30 May 25, 2001-- date for Ride-Your Bike to Work Day) that plaintiff references in a Disclaimer to be placed in her file. Plaintiff Exhibit No.   Memorandum to Frederick Sanders dated October 22, 2001 Subject: VORCELIA OLIPHANT, PLACEMENT OF REBUTTAL TO DEROGATORY MATERIAl IN PERSONNEL FILE signed by John J. Doody, Union Steward.

Next turn of events began after plaintiff filed her Federal Discrimination Complaint on April 2, 2002. Defendants began their retaliation on or about May 3, 2002 . Plaintiff takes exception to court's ruling 111 and offer of proof of emails, if she could submit them, between Plaintiff and Brian Castler dated from May 3, 2002 through May 17, 2002 final email. There are a total of 8 with one memo dated May 6 to B. Castler). These emails would show how more of plaintiff duties had been taken away at this time in

addition to the duties taken in the past couple of years. The false reason given yet commending plaintiff on the good job she had done with the duties. Also, shows how the outlook calendar again a potential harassment wherein boss offers to meet at a time when plaintiff is unavailable, a date offered by her boss that has been on her outlook calendar for over one month. Plaintiff acknowledging boss awareness of "the separate forum" in which the issue has been raised to be addressed. And the next turn of events began after August 4, 2003 when plaintiff filed notice of appeal for an injunction (Docket No. 126). As of August 21, 2003 defendants were again attempting their tactics to reprimand plaintiff without any warning or notice( plaintiff offer of proof if permitted would be emails dated August 6, 2003 which was a follow-up to a email on July 21, 2003 from plaintiff to Mike Lonergan. This email would show how the defendants, immediately increased their campaign of retaliation against plaintiff by changing her duties and seeking pretext to reprimand, making impromptu meetings of no explanation given to the plaintiff the nature of the meetings.

Plaintiff disclaimer attached, the department nor defendants provided no response to plaintiff's rebuttal (Ex. 7, disclaimer regarding alleged tardiness).

Pursuant to Federal Rule 46, plaintiff take exception barring her from presenting information of her duties being taken away in retaliation of the MIA and filing complaints. Her offer of proof if she were permitted would be an email dated March 8, 2001 4:00 pm from plaintiff to Arthur Gruhn, Administrator of her unit. The email is dated after the second meeting of the MIA group. Plaintiff raises concern regarding legislative work for which she explains that she believes she has been omitted from the process, how she initiated discussion on it with her supervisor who said he would follow-

up with office administrator and nothing done; how she holds the title of (legislative liaison ) but her duties in relation to the work have become null and expresses her desire to remain involved with legislative work. Plaintiff would offer as proof if she could letter notifying plaintiff of her passing exam score for the Strategy Board Manager, exam taken in November 2001. Administrative Memo naming Mr. Robert Hammersley to the the potion, Organizational Chart showing there being 77 manager positions with only 8 female managers and only one African-American Female manager in the department, Affirmative Action Statistical chart of the most current data at that time in 2001 for statewide LMA, Manager Officials/Adminstrators-various with its current goal wherein showing goals not met.

Paragraph 28 Deny plaintiff testified that individuals would have known by word of mouth, therefore not "personal knowledge" which she construed to mean first hand knowledge but she believes they had secondhand knowledge. Defendants would not have personal knowledge because they were not sent mailings of the MIA meetings nor included in the MIA meetings. Also, plaintiff bases this on the intense major pretext situations and harassment she began to experience at the time (Ex. 18, Plaintiff depo. Page 137: 10-16, Ex. paragraph number 27 above, Ex. 19 Page 144: line 24 through page 145 line 5 , page 136: line 2 through page 137 line 16).

Paragraph 29: Deny see 28 above,

Paragraph 30, See paragraphs Nos. 28-29 above.

## CERTIFICATION

This is to certify that a copy of the foregoing Plaintiff's Statement of Undisputed facts. has been mailed, US Postage prepaid, this 8th day of July 2005, in accordance to Rule 5(b) of the Federal Rules of Civil Procedure to:

Eleanor M. Mullen
Assistant Attorney General
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120


                                                  Pro Se

BY: _____
Vorcelia Oliphant
130 Cherry Ann Street, # 3
New Haven, CT 06514
(203) 237-7515

20